[No. 1005-2.    Division Two.    January 31, 1974.]

JOHN JARSTAD, *Respondent*, v. TACOMA OUTDOOR RECREATION, INC., *et al., Appellants.*

Robert L. Beale (of *Murray, Scott, McGavick, Gagliardi, Graves, Lane & Lowry*), for appellants.

Ronald E. Thompson (of *Lee, Krilich, Lowry & Thompson*), for respondent.

PEARSON, C.J.—This appeal is concerned with cross actions arising out of the sale of a Tacoma retail sporting goods business—Ski Hut Honda. Plaintiff, John Jarstad, sold that business in the late fall of 1970 to defendants Charles Woodke and Tacoma Outdoor Recreation, Inc. In connection with the sale, defendants, by separate instrument, agreed to employ plaintiff "as a consultant" for 5 years at a monthly salary of $800. Plaintiff was to serve in "an advisory capacity only in consulting and promoting the business of Tacoma Outdoor Recreation, Inc." An additional stated consideration for the employment agreement was a covenant that plaintiff would not compete with defendants in Pierce County in the sporting goods business for 5 years, commencing December 11, 1970.

Plaintiff's complaint, filed in March 1972, alleged that defendants performed under the employment agreement until December 1971, and then ceased and refused further performance. The complaint sought judgment on an accelerated basis for the remaining 4 years of payments ($38,800), for a reasonable attorney's fee, and for foreclosure of a lien in the amount of the judgment against the security interest, all of which relief was provided for in the security agreement.

Defendants answered the complaint by alleging that plaintiff had failed to perform the consulting services and instead attempted to "undermine and destroy" defendants' business reputation in various ways.

As a further counterclaim, defendants alleged that plaintiff had breached a warranty of the inventory rendered on November 4 and 5, 1970, by "fraudulently[1] overstating"

---

[1] The claim of fraud was not seriously pursued by defendants, and the trial court specifically found an absence of fraud.

that inventory by approximately $60,000. Defendants sought to offset their claimed damages against any sum that might be owed plaintiff and also sought an affirmative judgment for any excess amount which might be established. Plaintiff's reply generally denied the allegations of the counterclaim.

The case was scheduled for trial January 17, 1973. On January 2, 1973, defendants sought a continuance, which came on for hearing January 15. The motion, supported by affidavits, claimed inter alia that plaintiff had refused to supply certain documents and information which he had agreed to supply defendants in a pretrial deposition. It was claimed that these documents were necessary to establish the merits of defendants' counterclaim. These affidavits were countered by an affidavit of plaintiff's counsel which in effect asserted that the information sought was not in fact in plaintiff's custody or control and that defendants had not acted with diligence in obtaining the information by deposition or by formal demand for production under CR 34 and 37.

The trial court denied a continuance and proceeded to hear the case without a jury, commencing on January 17. After some 8 days of trial, the trial court rendered an oral decision, finding in favor of plaintiff on his complaint and concluding that defendants' counterclaim had not been established. Subsequently, defendants' motion for reconsideration was denied. Findings of fact, conclusions of law and judgment were entered, allowing plaintiff a judgment for $38,400, with 6 percent interest on a schedule of diminishing balances from December 1, 1971, to the date of judgment. Plaintiff was also awarded a judgment for attorney's fees in the amount of $8,000 and costs of $470.70. Finally, a decree of foreclosure on the assets of defendants' business was also entered.

On appeal, defendants advance 20 assignments of error, challenging certain findings and conclusions entered or the refusal of the court to enter certain of defendants' requested findings. The remaining nine assignments of error

relate to procedural or evidentiary rulings, including the denial of a continuance, which defendants claim prevented them from having a fair trial. Finally, defendants contend that the judgment awarded was excessive, and should be reduced to the present worth of the right to receive $800 per month from April 1972 to December 1975.

Plaintiff's cause of action and the findings which support it are challenged on the grounds the evidence did not establish that plaintiff had performed substantial services as contemplated by the agreement, but established, instead, that on some occasions plaintiff's actions had been detrimental to the business.

The challenged findings were to the effect that the agreement required plaintiff to render advice only when asked for by defendants; that defendant, Charles Woodke, was not receptive to advice; that the major consideration under the employment agreement was not plaintiff's personal services, but instead was the covenant not to compete, the sale of the business, and certain tax advantages; and that plaintiff had not caused any harm to the business. The court concluded that plaintiff had fully performed his obligation under the employment agreement, and defendants had not established their claim that plaintiff engaged in conduct detrimental to the business.

Our review of the evidence convinces us that there was substantial evidence supporting these findings. Insofar as the consulting agreement called for plaintiff to serve in "an advisory capacity only," the finding that he was to render advice only when requested is perfectly consistent. There was also substantial evidence to support the following part of the court's oral decision which explains the findings entered:

[I]n view of all the testimony it is my belief, and I find, that essentially the amounts to be paid under the agreement were part of the purchase price, that the agreement was used as a tax advantage, primarily, that Mr. Jarstad was to be available to render advice when he was asked for advice, and unless he was asked for advice he had no obligation to give it and he had no obligation to devote

any specific hours to it. Further, the non-competition provisions of the agreement are a major part of it and of major importance in the transaction.

■ When findings of fact are supported by substantial evidence, they will not be disturbed on appeal. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959).

The remaining question raised concerning plaintiff's cause of action is whether or not the accelerated judgment should have been reduced to its present worth. Defendants contend that we should apply the general rule which requires that an allowance for prospective damages must be reduced to its present worth. 53 Am. Jur. 2d *Master and Servant* § 62 (1970).

■ In this case, however, the acceleration remedy was specifically allowed in the security agreement. There was no provision for a reduction to the present value if the entire balance became due because of a default in payments. Had such been the intention of the parties, the provision should have been added. We are not permitted to reform that agreement or add to its terms in the guise of interpretation. *Poggi v. Tool Research & Eng'r Corp.*, 75 Wn.2d 356, 451 P.2d 296 (1969).

Furthermore, the trial court's finding that the monthly payments to plaintiff were more in the nature of consideration for the sale and for the noncompetition agreement mitigates against such an interpretation, were we inclined to make it. We could agree with defendants' argument only if the agreement for consulting services had contained no acceleration provision, and plaintiff's personal services had been the sole consideration for the future installment payments. *See* Annot., 90 A.L.R. 1318 (1934). Here the contrary is true, and we conclude that the refusal to discount the future payments was not error. Judgment on plaintiff's cause of action is proper in all respects and should be affirmed.

We next turn to the assignments of error relating to defendants' counterclaim. To establish a breach of the war-

ranty concerning the amount of inventory, defendants relied upon the expert testimony of George Fisher, a certified public accountant.

Mr. Fisher started his analysis with the inventory on hand in August 1971 and worked backward through defendants' records. By this method, he concluded there had been an actual shortage of $31,919 in the November 1970 inventory after applying what he considered to be a reasonable gross profit percentage. His analysis was based upon information supplied by defendant, Charles Woodke.

On two separate grounds, the trial court found and concluded that a breach of warranty of the inventory had not been established. First, the court determined that because of several irregularities in defendants' business practices and record-keeping methods, the information supplied to the expert witness was not credible, and the court was suspicious of its accuracy. The fact of these irregularities was established by substantial evidence.

It is solely within the province of the trial court to determine matters of credibility. *Ladley v. St. Paul Fire & Marine Ins. Co.,* 73 Wn.2d 928, 442 P.2d 983 (1968). The irregularities referred to above were sufficient to justify the conclusion that the information supplied to the expert witness was incomplete or unreliable. When that conclusion is reached, the trier of fact may disregard the opinion entirely. *See In re Estate of Hastings,* 4 Wn. App. 649, 484 P.2d 442 (1971), where we held that even where opinion evidence is persuasive, the trial court is not obliged to accept it.

Second, the trial court found and concluded that if there had been an inventory shortage, such fact should have been discovered by defendants, and the failure to timely assert the claim precluded the counterclaim. In support of this finding and conclusion was evidence that defendants had not asserted any claim of an inventory shortage until the answer and counterclaim were filed in May 1972. The court noted in its oral decision and in the findings of fact that defendants had actually assumed control of the business,

the inventory, and the records shortly after the inventory was made in November 1970 and before the sale was closed. Robert Fall, a store manager for plaintiff, completed the November inventory and almost immediately assumed the role of store manager for defendants. Plaintiff personally took no part in the inventory.

Furthermore, another inventory, which the trial court believed should have disclosed any shortage, was taken within 2 months of the sale. No claim was asserted by defendants for some 14 months.[2] The conclusion that the counterclaim for breach of warranty was not timely is justified in both fact and law. The applicable rule is contained in the Uniform Commercial Code, Sales, RCW 62A.2-607(3)(a) which provides that when a tender of goods has been accepted "the buyer must *within a reasonable time* after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . ." (Italics ours.)

In our view, where the sale of a business includes the sale of an inventory of "goods," the above section of the Uniform Commercial Code is applicable to the transaction. An inventory of sports merchandise must certainly be included within the broad definition of goods as contained in RCW 62A.2-105(1).[3] Furthermore, a buyer of a business who takes possession of the inventory and commences to operate the business by selling the inventory or adding to it, must be deemed as a matter of law to have accepted a tender of the goods as that term is used in RCW 62A.2-607(3).

By virtue of this provision, defendants were required to notify plaintiff of the breach of warranty of quantity within a reasonable time after the shortage was discovered

---

[2] Another inventory was taken in August 1971, and no claim of shortage was made until May 5, 1972.

[3] RCW 62A.2-105(1) provides, in part:

" 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action."

or should have been discovered. Failure to give timely notice of breach bars the buyer from *any remedy*.

Reasonable time, where no time limit is fixed by an agreement, depends on the nature, purpose, and circumstances of such action. RCW 62A.1-204. What may be considered a reasonable time is usually a mixed question of law and fact. *Kasey v. Suburban Gas Heat*, 60 Wn.2d 468, 374 P.2d 549 (1962). Normally, a determination of what constitutes a reasonable time is a question for the trier of fact. *Ringstad v. I. Magnin & Co.*, 39 Wn.2d 923, 239 P.2d 848 (1952).

In some cases, however, the undisputed factual situation may be such that the court can say as a matter of law whether a certain thing was or was not done within a reasonable time. *See Baum v. Murray*, 23 Wn.2d 890, 162 P.2d 801 (1945).

The trial court here made no specific finding that notice of the claimed breach was not asserted within a reasonable time, although such is the clear implication from the findings. Rather, after finding (1) that defendants had assumed control of the business and inventory prior to the closing of the transaction, and (2) that an inventory was taken by defendants on February 28, 1971, the court concluded that as a matter of law defendants were barred from an action. It was undisputed that the claim was not asserted until May 5, 1972. In conclusion of law No. 5, the trial court stated:

> At some point in time, although it may have been a contractual obligation at the beginning, defendants had chargeable to them all information that would have disclosed any shortage in the November, 1970 inventory, if in fact there was a shortage, and if they failed to receive it and act upon it then they are charged with that deficiency.

In our view, the court was justified in concluding either as a matter of fact or as a matter of law that defendants' claim of breach of warranty was not timely. The facts to establish the alleged breach were available to defendants

from the time they assumed control of the business. The opportunity to discover the breach, if any, was available at least by February 28, 1971. To assert the claim some 14 months later is unreasonable as a matter of law. In so holding, we point out the obvious. A business inventory of goods is not static. New merchandise is added to it as older merchandise is sold. Records of inventories are summarized and those goods which were physically present become virtually impossible to identify with the passage of time. The business conducts sales which dispose of large portions of an inventory at or slightly above the cost. The longer the business operates, the more complex becomes the task of determining on a cost basis the exact amount of an inventory at any particular past point of time. Such complexities are demonstrated by the difficulty encountered in this case of reconstructing the November inventory.

Furthermore, inaccuracies in record keeping as demonstrated by the evidence cast serious doubt upon the validity of the attempted reconstruction of the inventory. The seller of the business is not in any position to defend himself against a stale claim of this nature. He is not in possession of the records of the business and has lost control over the inventory. The situation is fraught with potentials for the buyer of a business to fabricate the shortage.

While stopping short of finding such a fabrication, the following statement made by the trial judge is, we think, indicative of his concern for the potential for fraud inherent in this case:

> I stop short of suggesting that Mr. Woodke and Mr. Fall colluded in the inventory with the thought of perhaps pulling it out of the hat later. I do not make that finding at this juncture. I merely conclude that the circumstances, as far as the ability of Mr. Woodke to know and his likelihood to want to know, are suspicious.[4]

The circumstances of this case are such that a reasonable

---

[4]The circumstances alluded to by the court are accurately summarized on pages 11 and 12 of respondent's brief and were fully discussed in the court's oral decision. It would serve no purpose for us to detail them in this opinion.

time for discovery of an inventory shortage should necessarily be a short time. Likewise, a reasonable time for giving notice of the shortage should necessarily be a short time. We conclude that as a matter of law defendants should be barred from any remedy involving the inventory rendered in November 1970 for failure to timely assert the claim. RCW 62A.2-607(3)(a).

The evidentiary rulings to which error has been assigned relate to the refusal of the trial court to admit defendants' exhibits J and L into evidence. Exhibit J was represented to be informal tally sheets relating to the February 1971 inventory. Defendants contend that these tally sheets were business records and admissible under the Uniform Business Records as Evidence Act. RCW 5.45.010 *et seq.* The trial court excluded exhibit J because defendants were unable to establish that the tally sheets were complete and covered the entire February inventory.

■ We agree with the trial court. The tally sheets would have little probative value to show a shortage of an earlier inventory unless they were complete. We do not see the Uniform Business Records as Evidence Act as compelling the allowance of *all* properly identified business records, which for some other reason may be unreliable or lacking in probative value. It is our view that this statute allows a party to avoid an objection that business records are hearsay because they contain entries made by persons who are not present to testify. *Cantrill v. American Mail Line, Ltd.*, 42 Wn.2d 590, 257 P.2d 179 (1953). The Uniform Business Records as Evidence Act is not an unrestricted license to admit in evidence wholly unreliable business records simply because they are business records. It has often been stated that the act does not render material contained in business records admissible which would otherwise be inadmissible, and the trial court is allowed discretion as to admissibility. That discretion should be given great weight. *Benjamin v. Havens, Inc.*, 60 Wn.2d 196, 373 P.2d 109 (1962); *Cantrill v. American Mail Line, Ltd., supra.* We find no abuse of discretion.

For much the same reason, we conclude that the court did not err in refusing exhibit L, which was represented to be a portion of the tally sheets concerning the November inventory. Defendants urge, however, that exhibit L was offered as demonstrative of the method used by plaintiff's store manager who took the disputed inventory.

The trial court is vested with broad discretion in the area of demonstrative evidence. *Pulley v. Pacific Coca-Cola Bottling Co.*, 68 Wn.2d 778, 415 P.2d 636 (1966). After viewing exhibit L, we presume that defendants desired to create an impression that the November inventory had been done in a haphazard manner. Without some explanation of the tally sheets by the one who prepared it, and in particular without testimony as to the manner in which the information was included in the completed inventory, any inference from the tally sheets would be misleading. We do not find an abuse of discretion in the exclusion of exhibit L.

Defendants next contend that they were procedurally denied a fair trial by three rulings made by the court: (1) denial of defendants' motion for a continuance; (2) denial of defendants' motion to reopen; and (3) denial of defendants' motion to call a surrebuttal witness.

It is axiomatic that all of these motions are addressed to the sound discretion of the trial court. The rulings of the court should stand unless we can say there has been a manifest abuse of discretion.

The reason for the continuance was marginal. Defendants contended they were not fully prepared. Plaintiff disputed defendants' diligence. Some of the information which defendants had sought to obtain had been in defendants' control but was not discovered until shortly before trial. Other information sought was available to defendants by use of discovery procedures. Under these circumstances, the trial court did not abuse its discretion in denying a continuance.

Before denying defendants' motion to reopen their case and the offer of surrebuttal witnesses, the trial court did consider an offer of proof and concluded that defendants,

during the lengthy part of their case, had ample opportunity to present testimony concerning the matters included in the offer. The court pointed out that some of the offered evidence was impeaching in nature and other evidence offered was already before the court.

The trial court recognized that the trial had been vigorously presented by capable counsel and at some point had to be brought to a conclusion. We find no abuse of this exercise of discretion.

The other assignments of error have been considered and we find them either without substantial merit or unsubstantiated by authorities.

Judgment of the trial court is affirmed. The case is remanded to the trial court for determination of reasonable attorney's fees to be allowed respondent on appeal. *F.S. Jones Constr. Co. v. Duncan Crane & Rigging, Inc.*, 2 Wn. App. 509, 468 P.2d 699 (1970).

PETRIE and ARMSTRONG, JJ., concur.

Petition for rehearing denied March 27, 1974.

Review denied by Supreme Court June 17, 1974.